**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL NO.  16-428** |
| | : | |
| **DAVID T. SHULICK** | | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States submits this sentencing memorandum in order to advise the Court with respect to matters relevant to sentencing in the above-referenced matter. The United States requests that it be afforded the opportunity to provide additional written submissions to the Court in response to any defense submissions or in the event that new issues arise at the loss hearing.

## I.    INTRODUCTION

David Shulick wanted the son of a United States Congressman on his staff.  In June 2009, Shulick hired a college dropout saddled with a portfolio of defaulted loans and no business experience for only one reason:  the dropout's father was Chaka Fattah, Sr.  Shulick needed political support for the Kelly Drive school in order obtain a $10 million contract with the School District of Philadelphia ("SDP") to educate some of SDP's most at-risk students. After a meeting with Chaka Fattah Sr., Shulick hired Fattah Jr. to work for DVHS as Chief Grants and Development Officer. Shulick began paying Fattah Jr. $75,000 in annual salary for two days per week of work. Not long after, in July 2009, political opposition to the Kelly Drive school faded, and Shulick obtained

1

the necessary approval for the Kelly Drive school. Shulick had cleared the way to his 3-year, $10 million contract with SDP.

In spring of 2010, Shulick began cutting Fattah Jr. in on the action. Shulick entered into contracts with Fattah Jr. and a shell company controlled by Fattah Jr., 259 Strategies. Shulick made Fattah Jr.'s company the minority business enterprise for DVHS's contract with SDP, which meant that for the 2010-11 school year, 259 Strategies would have revenue of $330,000 – some of which would be used to pay DVHS employees (defeating the purpose of the MWBE requirement) and some of which would go straight to Fattah Jr.'s pocket. Shortly after Shulick rewarded the college dropout with this princely sum, Shulick obtained the Southwest contract, which added another $1 million to his bottom line, $110,000 of which Shulick quickly siphoned to 259 Strategies under the guise of the MWBE requirement. Of course, Shulick controlled who and how much Fattah Jr. paid with the $110,000 and Shulick made sure that his expenses for counselors at other schools were paid with this money. He even made sure that this money supported DVHS's recruitment efforts in Bucks County. Nevertheless, Shulick intentionally decided he was not going to fund a counselor for the students at Southwest who so desperately needed that help. He opted to let them have a free intern or two. There would be no money for a professional counselor. He even failed to secure the free interns. Shulick was getting $4.3 million per year in SDP contracts. Shulick spent hundreds of thousands of dollars renovating his luxury home and his vacation properties in New Jersey – all the while trying to bury those expenses in his business to cheat the

government on taxes.  Fattah Jr. was getting over $430,000 per year to pay a few DVHS employees and live in style at the Ritz.  The students at Southwest got no counseling and scant security. All while the teachers did routine cleaning and maintenance, for a low salary and no benefits, in gratitude for which services, Shulick laid them off at the end of the year to cheat them of their last two months' salary.

Shulick, and his insatiable greed, sacrificed the welfare of the students at Southwest on the altar of personal profit. Shulick's thoroughly corrupt actions deserve a significant sentence of imprisonment at the high end of the guideline range. The Court should send a message to defendant Shulick and others who seek to profit by stealing public money, particularly money devoted to educating the children of our community, that a long prison sentence awaits those who violate the public trust by embezzling public money for their own benefit.

## II.    SENTENCING CALCULATION

### A.  Statutory Maximum Sentence

For the crimes of which defendant has been convicted, he faces the following

statutory maximum penalties:

| Crime | Description | Counts | Statutory Maximum Sentence | Statutory Maximum Fine | Supervised Release |
|---|---|---|---|---|---|
| 18 U.S.C. § 371 | Conspiracy | 1 | 5 years | $250,000 | 3 years |
| 18 U.S.C. § 666(a)(1)(A) | Embezzlement | 1 | 10 years | $250,000 | 3 years |
| 18 U.S.C. § 1344 | Bank Fraud | 1 | 30 years | $1,000,000 | 5 years |
| 18 U.S.C. § 1014 | False Statements to a Bank | 1 | 30 years | $1,000,000 | 5 years |
| 26 U.S.C. § 7206(1) | False Tax Return | 3 | 3 years | $100,000 | 1 year |
| | **Totals** | | 84 years | $2,800,000 | 5 years |

### B.  Sentencing Guidelines Calculations

The counts charging conspiracy, embezzlement, bank fraud and false statements

to the bank are grouped for sentencing guidelines calculation purposes.   U.S.S.G.

§ 3D1.2(d); PSR ¶ 50.  Defendant's base offense level is 7.  U.S.S.G. § 2B1.1; PSR ¶ 53.

Defendant's base offense level should be enhanced for the reasons set forth below.

#### 1.  Fraud Loss

The government agrees with the probation officer's conclusion that the fraud loss

caused by defendant's conduct is $948,234.   This fraud loss triggers a 14-level

enhancement under U.S.S.G. § 2B1.1(b)(1)(H).   PSR ¶ 54.   The government has

4

explained its fraud loss calculations in two briefs, which have been filed separately, and which the government adopts here by reference. *See* Doc. Nos. 201 & 208.

Additionally, the government notes that the court in *United States v. Chaka Fattah, Jr.*, 2:14-CR-00409, found that the fraud loss Fattah, Jr. caused to SDP was $940,000. *See* Sentencing Transcript at 42 (Feb. 2, 2016). The court's finding in *Fattah, Jr.* is consistent with the probation officer's finding here and supports the government's position on loss.

### 2. Organizer, Leader, Manager or Supervisor

The government agrees with the probation officer's conclusion that defendant should receive a two level enhancement under U.S.S.G. § 3B1.1(c) for being an "organizer, leader, manager, or supervisor" in the criminal conspiracy and fraudulent schemes for which he was convicted. In order to be an organizer or leader "the defendant must have exercised some degree of control over others involved in the commission of the offense." *See United States v. Phillips*, 959 F.2d 1187, 1191 (3d Cir. 1992). Factors that are relevant to this determination include:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, App. Note 3. Application of the relevant factors here shows that the enhancement should apply.

The evidence and trial showed that defendant and his co-conspirator and co-

5

schemer Fattah, Jr. worked together to defraud the school district, but that defendant directed the scheme in every regard. Witness after witness at trial testified that defendant exercised nearly absolute control over every aspect of his business; this fraudulent scheme with Fattah, Jr. was no exception. Fattah, Jr. was hired in 2009 to be Chief Grants and Development Officer of DVHS. Gov't Ex. 214.[1] Despite his lack of success in that role, defendant quickly arranged for Fattah, Jr. and his company, 259 Strategies, to serve as a minority pass-through by which SDP funds were distributed away from Southwest students, and in part to non-SDP contractors, serving non-SDP students, outside of Philadelphia. Gov't Ex. 217. Within months, defendant was paying Fattah, Jr.'s company $450,000 per year. Defendant nevertheless retained nearly complete control over the finances of the company that Fattah, Jr. nominally headed. Gov't Ex. 219. Indeed, Fattah, Jr. provided monthly accounting statements for defendant's approval, showing how he spent the funds that DVHS allocated to his company, Gov't Ex. 221, and most of the payments by Fattah, Jr.'s company were for debts that were owed by DVHS.

Additionally, like 259 Strategies' expenditures, Fattah, Jr.'s interactions with SDP were carefully choreographed by defendant. Defendant took Fattah, Jr. under his wing. Andre Bean, who observed the interactions between the two men directly, testified that Fattah, Jr. was nothing more than a middleman, or a filter, who passed

---

[1] The government cites trial transcripts at "Gov't Ex.___" and sentencing exhibits as "Ex.___." The government attaches the latter category of exhibits to this memorandum and would be glad to provide additional copies of the trial exhibits should the court require them.

along requests to Shulick. *See* Trial Tr. 46:4 – 48:12 (May 2, 2018). This dynamic is clear in the email communications between defendant and Fattah, Jr. Shulick clearly viewed himself as an older mentor who would teach Fattah Jr. the ropes of running a business and managing his finances. *See*, *e.g.*, Gov't Exs. 135 & 259. Shulick even went so far as emailing Fattah, Jr.'s family members about their work together. Exs. 1, 2, 3, 4.

The depth of Shulick's commitment to the Fattahs – and the degree to which he wanted to retain his connection to Fattah, Sr. and his clout – becomes apparent when Fattah, Jr. is taken back into DVHS after being fired in August 2011. Despite infuriating Shulick by squandering Shulick's largesse and bouncing checks to Shulick's employees, he is not attacked like other employees who displeased Shulick. He was re-hired with an annual salary of $144,000. In his deposition in Fattah, Jr.'s lawsuit, Shulick stated this number was determined by Fattah, Sr. Why would David Shulick permit Fattah, Sr. to dictate that salary? Shulick also used Fattah, Jr. to act as the MWBE to satisfy his contract with SDP, but then set up his contracts with Fattah, Jr's company (259 Strategies) to make 259 Strategies a pass through to pay DVHS employees who were not working with SDP students. This shows Shulick's level of control of their relationship. Shulick clearly controlled every aspect of Fattah, Jr.'s involvement at DVHS. Fattah, Jr., on the other hand, made no decisions of consequence with respect to the fraud.

In addition, defendant took the far greater share of the illegal proceeds. As

detailed in the government's loss memorandum, defendant misappropriated over $940,000. Fattah, Jr. got a much smaller share of those funds—totaling less than Fattah, Jr.'s 10% share of the contract for the 2010-11 school year, which was $110,000.[2] As proven at trial, Fattah, Jr. used a portion of these funds to pay DVHS counselors at other schools and Mark Kaye, which directly benefitted Shulick.

The trial evidence established that this scheme was developed and implemented by defendant. He used Fattah, Jr. only to the extent he found it convenient and necessary to do so. Defendant therefore had a leadership role in the conspiracy and in the fraud, and should receive a two level enhancement under U.S.S.G. § 3B1.1(c).

### 3. Enhancement for Educational Organization Misrepresentation

The government respectfully recommends application of a two level enhancement under U.S.S.G. § 2B1.1(9)(A) because defendant's crime included a "misrepresentation that the defendant was acting on behalf of a[n] . . . educational . . . organization . . . ." Notably, the fact that DVHS actually provided some educational services and was associated with an educational organization does not preclude application of the enhancement. The commentary provides that this enhancement applies

> in any case in which the defendant represented that the defendant was acting to obtain a benefit on behalf of a[n] . . . educational . . . organization . . . (*regardless of whether*

---

[2] During the 2011-12 school year, Fattah Jr. was no longer the minority contractor and no longer paid a percentage of the Southwest contract. Therefore, none of the proceeds of the fraud were taken by Fattah Jr. in the second year.

> *the defendant actually was associated with the organization or government agency*) when, in fact, the defendant intended to divert all or part of that benefit (e.g., for the defendant's personal gain).

U.S.S.G. § 2B1.1, comment 8 (emphasis added).  In other words, for the purposes of determining whether the enhancement applies, it is irrelevant whether defendant actually worked for an educational organization so long as he purported to do so while intending to divert at least part of the benefit that he received.  *See United States v. Evans*, No. 12-30042, 2014 WL 1813168, at *3 (C.D. Ill. May 6, 2014) ("The fact that Defendant might have used a portion of the funds to provide some charitable or educational services makes no difference to the applicability of the two-level enhancement. The evidence showed that Defendant intended from the beginning to divert a part of the funds for her own use despite representing that she would use all of the funds for their intended charitable and educational use."). In this case, the trial record conclusively establishes that defendant told SDP in his budget submissions that he was seeking funding to provide certain, enumerated services to the students of DVHS while nevertheless intending to embezzle a portion of those funds for his own enrichment.

The government notes that the conduct described above is separate from the conduct that gives rise to the enhancement under § 3B1.3—namely, that defendant abused the trust afforded to him by SDP by embezzling funds under the contract. This enhancement under § 2B1.1(9)(A) is applicable due to the specific misrepresentations Shulick made to induce SDP to enter into the original contract and, in 2011, the

amended contract, with DVHS.   The conduct is distinct, and therefore, both §

2B1.1(9)(A) and § 3B1.3 should be applied to account for the different harms.   *See*

U.S.S.G. § 2B1.1, comment 8(E)(i).

### 4. Obstruction of Justice

The government respectfully recommends a two level enhancement for

defendant's obstruction of justice, *see* U.S.S.G. § 3C1.1, which occurred on at least two

occasions:

- First, when defendant testified falsely in a civil proceeding pertaining to his crimes.

- Second, when defendant caused amended tax returns to be filed on behalf of DVHS bearing the false signature of Matthew Chalal, who was then nominally the president of DVHS.

Section 3C1.1 provides that

> If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any related conduct; or (ii) a closely related offense, increase the offense level by 2 levels.

Application Note 4 expressly anticipates that the enhancement for obstruction

of justice will apply to "committing, suborning, or attempting to suborn perjury,

including during the course of a civil proceeding if such perjury pertains to conduct

that forms the basis of the offense of conviction" and to "[p]roducing or attempting to

produce a false, altered, or counterfeit document or record during an official

10

investigation or judicial proceeding."

### a. Defendant Lied In His September 27, 2016 Deposition

In this case, defendant lied under oath in a September 27, 2016 deposition taken in *Chakka Fattah, Jr. v. United States of America*, Civ. A. No. 14-1092 (E.D.Pa). That deposition was taken by attorneys for the United States, and addressed nearly all of the conduct for which defendant was convicted in this matter.[3]  First, defendant testified that he did not make any false statements to SDP:

> Q.   Mr. Shulick, as it relates to the Southwest school -- as it relates to the contract for DVHS Southwest between Unique Educational Experience and the Philadelphia School District, did you make any false statements or misrepresentations to the Philadelphia School District related to that contract?
>
> A.   No.
>
> Q.   Were you part of some kind of scheme to keep the school district through the use of false budgets related to the Southwest school?
>
> A.   No.

Depo. Tr. 109:2-15.  Of course, the government proved beyond a reasonable doubt at trial that defendant in fact had made false statements to SDP and had submitted false budgets to SDP.  Defendant's testimony to the contrary obstructed the course of this criminal proceeding because a truthful answer would have been plainly inculpatory.

Defendant also lied about using SDP funds for personal reasons and attempting to cover those uses by asking vendors to alter their invoices:

> Q.   Did you ever use school district money to pay for condo renovations at 7600 Atlantic Avenue?
>
> A.   No.
>
> Q.   Did you ever direct a vendor for your condo renovations to change

---

3 The deposition transcript is attached hereto as Exhibit 5.

the invoice to reflect that it was done at Delaware Valley High
School?

A.   No.

Depo. Tr. 94:11-19.

Q.   While [Chaka Fattah, Jr.] was at DVHS, did the company expense
personal expenses of yours in the guise of corporate expenses?
. . . .

A.   No.

Depo. Tr. 118:15-24.

The evidence presented at trial refuted this testimony.  There was substantial

testimony pertaining to the use of SDP money for projects at defendant's New Jersey

shore home.  Additionally, Paul Kubaska, one of the vendors who defendant retained

to renovate his shore house testified that he submitted an invoice to defendant directly,

and defendant asked him to resubmit it to DVHS.  Trial Tr. 20:11-22:1 (April 23, 2018).

Additionally, there was substantial testimony that defendant submitted all sorts of

personal expenses as business expenses in both his Quickbooks accounting software

and on his tax returns.  This testimony is directly relevant to this matter because

truthful answers would have incriminated defendant.

Defendant also lied about his knowledge of Fattah, Jr.'s business—259

Strategies:

Q.   And do you know what percentage [of the $450,000 that DVHS paid to
Fattah, Jr.'s company] was going to his compensation versus
subcontractors and the others fees that he would have as a minority
business subcontractor to DVHS?"

A.   No.

Depo. Tr. 11:19-24.  That testimony is false.  The government produced a variety of documents establishing that defendant knew how Fattah, Jr. was spending money allocated to 259 Strategies.  Indeed, defendant required Fattah, Jr. to provide him with monthly statements showing how the money had been spent.  *See*, *e.g.*, Gov't Ex. 135. And defendant had a reason to lie—a truthful answer would have exposed the fact that he knew that money designated by SDP for the students of the Southwest School was being siphoned out to pay defendant's expenses outside the district.

Finally, in an effort to distance himself from decisions that he knew could give rise to criminal charges, defendant lied repeatedly about his level of involvement in decisions made by DVHS.  The trial evidence established conclusively that there were no decisions of any significance made at any of defendant's companies that were made without defendant's input and blessing.  Nevertheless, he testified that he did not fire the DVHS Southwest teachers at the end of the school year:

> Q.   While [Fattah, Jr.] worked at Delaware Valley High School, did you layoff teachers going into the summer so you didn't have to pay them the rest of their salaries?
>
> A.   I don't recall that, and I didn't layoff anyone. I didn't hire or fire anyone.
>
> Q.   You didn't hire or fire anyone at Delaware Valley High School?
>
> A.   No. That was the job of the people, Mattie Thompson or others, Andre Bean, who knows.
>
> Q.   So I just want to be clear here, you didn't hire or fire anyone from 2009 to 2012?
>
> A.   No. I -- I -- I was faced with issues that were caused by sometimes the school district's breaching or an issue would have been escalated up to me by an executive and I would have to give an opinion. And if the handbook was not complied with, then the opinion would very -- be legal.

Depo. Tr. 95:9-96:3.  This testimony is filled with falsehoods.  First, the suggestion that defendant did not hire and fire at DVHS was rejected at trial.  With respect to the particular decision to fire teachers to avoid paying them over the summer, Mattie Thompson and Andre Bean both testified that that decision was made by defendant. *See* Trial Tr. 224:16–226:10 (May 2, 2018); Trial Tr. 169:17-24 (April 27, 2018) ("Q. . . . Did Mr. Shulick tell you what the purpose of this tracking document dated June 4, 2011 was? . . .  why is it being created" A.  Because he wanted to lay off teachers for that summer or lay off certain people.").  Additionally, the contention that he somehow would have failed to recall that he had fired those teachers is non-credible.  It happened in two successive years and both times gave rise to a variety of threatened and actual litigation and, ultimately, settlements.

This false testimony is significant to the criminal prosecution against defendant. Truthful answers would have established that defendant had misappropriated money away from the teachers' salaries.

Defendant also testified that he did not make final decisions on the salaries paid to DVHS Southwest employees:

> Q.   Who made the final decision on salaries for the Southwest school?
> A.   Mattie Thompson, Andre Bean, and possibly [Chaka Fattah, Jr.], and possibly Kenyatta Johnson, who's a director. Directors always were responsible for who was beneath them.
> Q.   Is it your testimony -- I just want to make sure I'm clear.  Is it your testimony that you didn't make the final decisions regarding expenditures for Delaware Valley High School Southwest?
> A.   That's absolutely correct. The decisions that I -- but I will state – I will say this, I -- I made the decision to invest a couple hundred thousand dollars into that building as a condition of anything.

14

Depo. Tr. 110:14-111:9.

When read in its entirety, defendant's testimony at his September 2016 deposition was designed to obstruct the criminal investigation. Had defendant testified truthfully about any of the topics above, that testimony would have been inculpatory in the criminal investigation.

> b. *Defendant Fraudulently Altered and Notarized a Document Suggesting that Matthew Chalal Had Approved the Filing of Amended Tax Returns on Behalf of DVHS*

Defendant's submission of amended corporate tax returns for 2009-2012, bearing Matthew Chalal's signature—without Chalal's authorization or approval—is a second example of conduct that should trigger application of the obstruction enhancement under U.S.S.G. § 3C1.1. Defendant used a fairly elaborate ploy to make a record suggesting he had obtained Chalal's authorization to sign the amended tax returns, when he in fact did not have Mr. Chalal's permission. Instead, his use of Chalal's signature was merely an effort to distance himself from the admissions in the amended tax returns.

Matthew Chalal served as the nominal president of DVHS after the FBI raids forced defendant to take a less public role. Among other responsibilities, Mr. Chalal signed off on various financial filings of the corporation, but testified that he did so only with defendant's approval. The court heard testimony that in late August 2014, while Mr. Chalal was on vacation at the New Jersey shore, he received a telephone call and a subsequent email from defendant, who requested Chalal's permission to sign Chalal's

name to some undisclosed financial filings.  Trial Tr. 80:1-82:3 (Apr. 23, 2018).  Chalal approved the request.  Then, when Chalal returned from vacation, defendant provided him a copy of the email request and asked him to sign it.  Chalal did so.  Chalal testified that when he approved defendant's request to sign his name to unspecified documents, he did not know precisely what documents defendant was referencing.  Chalal authorized defendant to use his name because it was within the scope of his job responsibilities to sign certain financial documents and, although he was the president in name, defendant was the sole shareholder and decision maker—if defendant wanted the documents signed, they would be signed.  *Id.*

As it turns out, defendant signed Chalal's name to amended corporate tax returns for the years 2009, 2010, 2011, and 2012, which were the subject of the then-pending criminal investigation.  After Chalal had signed the document, defendant added handwritten language under Mr. Chalal's signature which stated: "I have reviewed and approved filing all corporate returns based on work of RSCF and my book-keeping. I am in charge of DVHS finances."  Gov't Ex. 472; *see also* Trial Tr. 83:6-7 (identifying the handwriting as belonging to defendant).  Defendant then applied his own notarial seal above the email.  Chalal testified that he did not know that defendant had signed his name to DVHS's amended tax returns.  And that neither the handwritten language nor the notarial seal were on the document when he signed it.

In short, defendant fraudulently and without authorization signed Chalal's name to DVHS's amended tax returns.  Defendant did not want to sign his own name

because the amended returns were an admission that the original returns were incorrect.   At the time, Defendant knew he was the target of a criminal tax investigation because he had been interviewed by federal agents on that subject.  The submission of the amended returns under Chalal's signature were designed to mislead agents into believing that Chalal, and not defendant, had initiated and approved the amended returns.   This constituted obstruction of the criminal investigation.   *See* U.S.S.G.  § 3C1.1, App.  Note  4(C)  (applying  the  enhancement  to "producing  or attempting to produce a false, altered, or counterfeit document or records during an official investigation or judicial proceeding.").

### 5. Abuse of Trust

Shulick also deserves an enhancement under U.S.S.G § 3B1.3 for abuse of trust because he held an important position of trust.  He was vested with authority to expend $2 million to educate 200 SDP students over 2 years.  He had sole authority to expend those funds to meet the needs of the students as spelled out in the contracts. He used that position to enrich himself at the expense of those students, thus abusing his position of trust.

Under U.S.S.G. § 3B1.3, the defendant's sentence is increased by two levels "[i]f the defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. In order to apply the enhancement, the Court must first consider whether defendant held a position of trust and then whether the defendant used that position

of trust to significantly facilitate the offense. *United States v. Douglas*, 885 F.3d 124, 133-34 (3d Cir. 2018); *United States v. Nathan*, 188 F.3d 190, 205 (3d Cir. 1999). A position of trust depends on "whether the defendant had the power to make decisions substantially free from supervision based on (1) a fiduciary or fiduciary-like relationship, or (2) an authoritative status that would lead his actions or judgment to be presumptively accepted." *Douglas*, 885 F.3d at 133. Unlike the defendant in *Douglas*, Shulick "had the power to make decisions substantially free from supervision based on a fiduciary or fiduciary-like obligation" to SDP. *Douglas*, 885 F.3d at 134. Under the contract, Shulick was granted discretion, and given a high level of trust, as well as autonomy to make staffing decisions, that created a fiduciary-like obligation to provide services to the students that SDP entrusted to his care.

In addition, Shulick held authoritative status as the President of DVHS who was formally recognized as the provider of alternative education services for the Southwest school. Shulick had authority to expend $2 million to supply education to 200 students at Southwest. He was given discretion by SDP to make decisions regarding staffing and the way in which services were provided. SDP granted Shulick a position of authority as one of only a few outside contractors providing alternative education to SDP students. He was essentially the sole authoritative administrator overseeing the implementation of the contract, and expenditure of funds, at Southwest. Therefore, Shulick held a position of trust as described in Guideline §3B1.3.

The second *Douglas* prong requires that the Court find that defendant's position

of trust "significantly facilitated the commission or concealment of the crime." *Douglas*, 885 F.3d at 134. The evidence plainly proves that Shulick was subject to little oversight, particularly as to the expenditure of SDP funds, and his judgments were presumptively accepted.[4] The §3B1.3 application note defines professional or managerial discretion as "substantial discretionary judgment that is ordinarily given considerable deference." U.S.S.G. § 3B1.3 Note 1. Shulick's role making decisions about the operation of the Southwest School and submitting false invoices to SDP was analogous to the physician's role making diagnoses and submitting false insurance claims in *United States v. Sherman*, 160 F.3d 967 (3d Cir. 1998) (physician defendant was in a "particular [position] of authority whose judgment would be presumptively accepted" when submitting insurance claims); *Douglas*, 885 F.3d at 133 nt. 5. Shulick's decisions about how to run the school, like the defendant's judgments about patient diagnoses in *Sherman*, were given substantial deference by SDP. Shulick was a lawyer and president of a company that held multiple contracts with SDP and other school districts to provide educational services, a position that would inspire others to defer to his professional judgment on the administration of a school. SDP permitted Shulick to control the operation of the Southwest School and deferred to him on matters related to executing the contract. Although SDP approved the line-item budget that

---

[4] Although *Douglas* abrogated the *Pardo* test, the *Douglas* court noted that several Third Circuit cases decided under the *Pardo* test would also fit under one of the two prongs of the new *Douglas* test. *United States v. Douglas*, 885 F.3d 124, 133 nt. 5 (3d Cir. 2018); *United States v. Pardo*, 25 F.3d 1187, 1192 (3d Cir. 1994), *abrogated by United States v. Douglas*, 885 F.3d 124 (3d Cir. 2018).

governed the contract, SDP gave Shulick free reign to hire staff and make operational decisions to fulfill the terms of the contract. Shulick was in a position where his judgment about the school's finances and operations would be presumptively accepted, and this autonomy significantly facilitated his commission of the offense.

Though the *Douglas* court abrogated the use of the *Pardo* factors for purposes of determining whether the defendant occupies a position of trust, the court noted that the *Pardo* factors are relevant for determining whether the defendant abused a position of trust. *Douglas*, 885 F.3d at 134. Those factors are "(1) whether the position allows the defendant to commit a difficult-to-detect wrong; (2) the degree of authority which the position vests in defendant vis-a-vis the object of the wrongful act; and (3) whether there has been reliance on the integrity of the person occupying the position." *United States v. Pardo*, 25 F.3d 1187, 1192 (3d Cir. 1994), *abrogated by United States v. Douglas*, 885 F.3d 124 (3d Cir. 2018). Each of those factors favors application of the enhancement in this case.  In the absence of oversight, Shulick used his position to evade detection by submitting false budgets and controlling finances, and instructing employees who confronted him that he was the boss and he would do as he wished. Shulick's position as president of DVHS enabled him to commit a difficult-to-detect wrong, therefore fulfilling the first prong of the *Pardo* test.  Second, the degree of authority granted to Shulick by the SDP was similar to the amount of authority granted to Nathan by the government agencies. *United States v. Nathan*, 188 F.3d 190, 205 (3d Cir. 1999).  In both cases, there was no monitor appointed to ensure compliance

with the terms of the government contracts and the defendants were granted significant autonomy in fulfilling the terms of the contracts. Finally, under the third prong, the government agencies in both *Nathan* and the instant case showed similar degrees of reliance on the defendants' integrity. In both cases, the government failed to monitor the defendants' performance, accepting the defendant's assertions of compliance at face value. Therefore, Shulick's conduct satisfied all of the *Pardo* factors, which under *Douglas* requires that Shulick be held responsible for abusing his position of trust.

Other circuits have found that government contractors operating educational facilities can occupy a position of trust. *See United States v. Robinson*, 198 F.3d 973 (D.C. Cir. 2000). In *Robinson*, the District of Columbia Public Schools ("DCPS") contracted with defendant Robinson to open and operate a new school for emotionally disturbed teenagers, despite the fact that Robinson had no college degree or experience in education. *Id*. at 975. On his invoices to DCPS, Robinson inflated the number of students who attended the school to receive more funds. *Id*. Very little of that money went toward school expenses, with much of it going toward personal expenditures. *Id*. at 976. Robinson failed to provide the educational and counseling services required under the DCPS contract. *Id*. DCPS conducted minimal monitoring of compliance, sending DCPS special education monitors on periodic visits to assess compliance with federal law for providing educational services for students with disabilities, but did not review the school's financial records. *Id*. at 978. The court found that Robinson, as the

21

president of the school, was afforded broad managerial discretion and therefore occupied a position of trust. *Id.* In making that determination, the court considered Robinson's full control over the invoices he submitted, sole access to the school's checking account, complete discretion in hiring staff and in setting its curriculum, and the school district's lack of monitoring. *Id.*

Like the defendant in *Robinson*, Shulick controlled all of the financial and hiring decisions at the school. DSPS in *Robinson*, and SDP in this case, provided little supervision of the defendants, reflecting the level of trust placed in the defendants. Unlike *Robinson*, Shulick actually had experience operating schools and therefore had a level of professional expertise that warranted SDP's presumptive acceptance of his actions and judgments. Indeed, DVHS's promotional materials and Shulick's submissions to SDP to obtain the contracts proclaimed the expertise of DVHS. Based on Shulick's broad authority and the SDP's limited oversight, Shulick, like Robinson, occupied a position of trust vis-à-vis SDP, and exploited that position to embezzle SDP funds. The enhancement for abuse of a position of trust pursuant to Guideline §3B1.3 should be applied.

### 6. Tax Fraud Charges

Under the grouping rules set forth in U.S.S.G. § 3D1.1, defendant's tax fraud does not have any impact on his guideline range because the offense levels associated with those crimes are "9 or more levels less serious than the Group with the highest offense level"—i.e, the fraud charges. U.S.S.G. § 3D1.4(c). Specifically, the tax loss

22

gives rise to an offense level of 16, which is 13 levels lower than the fraud loss offense level.  U.S.S.G. §§ 2T1.1(b)(1); 2T4.1(E).  In circumstances like this, where a crime does not affect the guideline range, the guidelines provide that the crime may nevertheless "provide a reason for sentencing at the higher end of the sentencing range for the applicable offense level."  U.S.S.G. § 3D1.4(c).  In this case, to account for the fact that defendant is not being punished under the guidelines for his substantial tax fraud, the government requests a sentence at the high end of the guideline range.

### 7.  Summary of Guideline Range Calculations

The defendant's base offense level of **7** is enhanced as follows:

- **14** levels under U.S.S.G. § 2B1.1(b)(1)(H) for causing a fraud loss of $948,234.

- **2** levels under U.S.S.G. § 3B1.1(c) for being an "organizer, leader, manager, or supervisor."

- **2** levels under U.S.S.G. § 2B1.1(9)(A) because defendant's crime included a "misrepresentation that the defendant was acting on behalf of a[n] . . . educational . . . organization . . . ."

- **2** levels under U.S.S.G. § 3C1.1 for obstruction of justice.

- **2** levels under U.S.S.G. § 3B1.3 for abuse of trust.

In total, defendant's offense level is **29**.  The government agrees with the probation officer that defendant's criminal history places him in category I.  Therefore, defendant's guideline range is **87-108** months.

## III.   SENTENCING FACTORS

"As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).   "These requirements means that '[i]n the usual sentencing, . . . the judge will use the Guidelines range as the starting point in the analysis and impose a sentence within the range." *Peugh v. United States*, 133 S. Ct. 2072, 2083 (2013) (quoting *Freeman v. United States*, 131 S. Ct. 2685, 2692 (2011) (plurality opinion; ellipsis in original)).   "Common sense indicates that in general, this system will steer district courts to more within-Guidelines sentences." *Id.* at 2084. "The federal system adopts procedural measures intended to make the Guidelines the lodestone of sentencing." *Id.*

This Court must also consider all of the sentencing considerations set forth in Section 3553(a).  Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner;  (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found

24

guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.  18 U.S.C. § 3553(a).

### A.    The Nature and Circumstances of the Offense

These were serious crimes. Defendant stole from the School District of Philadelphia, which even without frauds like this one is under constant threat of catastrophic financial failure. Defendant also stole from the students of the Southwest School. In order to fund his luxury home, shore house, and Range Rovers, defendant diverted funds from one of the most vulnerable student populations in the School District. The Southwest School catered to students with attendance problems and those who had dropped out of school altogether. The court heard testimony about why students entered the Southwest School—unplanned pregnancies, abusive family situations, and criminal convictions, to name simply a few reasons. SDP knew that this vulnerable student population needed special services—guidance counselors, a secure learning environment, and experienced teachers. SDP put these requirements into its contract with defendant to ensure that its vulnerable students got the services that they needed. Despite SDP's efforts, defendant ignored the needs of the students he was charged to protect and serve, and instead used the money to fund a lavish lifestyle for himself.

He also stole from the teachers and staff members at the Southwest School. Those teachers and staff members sought careers in education because they wanted to make a difference. Teaching at the Southwest School was not an easy assignment. The

students there were dealing with all sorts of issues that made learning a secondary priority. Under the best of circumstances, teaching is not financially lucrative. Nevertheless, defendant sought at every turn to squeeze a little more out of the teachers. First, he paid them $9,000 less than his contract with SDP required.  Second, rather than paying for their benefits that the contract with SDP required, he made them pay their own benefits or elect to have none. Third, he required teachers and administrators to fill the role of guidance counselors, security guards, and maintenance staff—because he refused to hire enough people to fill those roles. Finally, and most egregiously, he twice laid off teachers at the end of a school year to try to avoid paying them for the final two months of the year. After putting up with the already increased hours and reduced pay, they had to threaten litigation simply to get paid what they were owed. Meanwhile, defendant presumably orchestrated this final indignity while sitting in his newly-refinished shore house overlooking the ocean.

## B.   The History and Characteristics of the Defendant

Shulick's history and characteristics reveal a person who cheated at every turn in order to gain advantage. But he didn't simply cheat people, he degraded and humiliated them and verbally abused them in order to control them.  The trial testimony revealed his outrageous treatment of his bookkeepers and other employees, calling them by the foulest names, and yelling at them to the point where they were emotionally scarred and terrified to confront him or displease him. That this outrageous behavior was mixed with intermittent charm makes it worse not better.

The employees had no idea which David Shulick they were going to get, the ferocious terror or the charming boss.

This uncertainty ended when Shulick was finished taking what he needed from people; at that point, he consistently attacked. When teachers had taught for a 10 months but were still owed 2 months salary, he laid them off.  Then, when advised by Mattie Thompson that the teachers were upset, he could not have empathized less, simply responding "chill…no worries...talk am."  *See* Ex. 6.

He was a master at public humiliation, routinely sending emails to the whole DVHS leadership team, and others, which served to berate a single employee.  He used this tactic on Kathy Keyser, Fattah, Jr., and even his outside accountants, among many others.  *See* Exs. 7 (Keyser), 8 (Fattah, Jr.), 9 (outside accountants), 10 (other outside accountants).

When contractors had completed their work for him, he failed to pay, refused to pay, or began nasty attacks to complain about the work so he could renegotiate the amount owed. Where necessary he threatened to sue.  *See* Ex. 11.  In one particularly appalling example, he berated a carpenter so feverishly on the jobsite that the man decided to abandon carpentry altogether and seek a different profession. *See* Ex.12.  In another, he threatened to report a contractor to the Montgomery County district attorney, who he claimed to know personally, over a disagreement.  *See* Ex. 13.

He sometimes wrote abusive emails and then forwarded them to others for sport. In one example, he wrote a blistering email to his former accountants alleging, among

other things, "GROSS INCOMPETENCY AND OUTRIGHT FRAUDULENT DEALINGS." *See* Ex. 9 (capital letters in original). Then, hours later he forwarded that email to his financial planner with the note "for your amusement." *See id*. When employees were fired and applied for unemployment, Shulick tried to avoid that cost by contesting their entitlement to unemployment, sometimes sending Fattah, Jr. to appear at the hearing for DVHS. When he wanted Matt Chalal to be responsible for filing DVHS's taxes, he concocted a scheme to get Chalal to sign an innocuous email, and then added language near the signature to alter the meaning of the email. Shulick then had Chalal's signature forged on the tax returns.

That did not end defendant's mistreatment of Mr. Chalal. In 2015, when DVHS was in the process of losing its remaining school contracts, defendant fired Mr. Chalal. Several days later, however, defendant summoned Chalal to a meeting at defendant's home, at which defendant attempted to have Mr. Chalal sign an affidavit in which he admitted to embezzling funds from DVHS. Mr. Chalal, who had not embezzled funds and therefore was understandably extremely upset about the situation, asked for an opportunity to review the affidavit more carefully with his lawyer. Defendant denied that request and told Mr. Chalal that if he left without signing the affidavit, he would report the company car that Mr. Chalal was driving as stolen and call the police. Shulick extorted Chalal into signing the affidavit and to this day Chalal does not know exactly what it contained. In the weeks following his termination from, Mr. Chalal suffered extremely serious distress about Shulick's treatment of him.

28

Defendant also used his friends and associates to curry favor with politically connected people.  For example, in the spring of 2010, defendant hosted a golf outing as a fundraiser for Chaka Fattah, Sr.  Wanting to fill Fattah, Sr.'s campaign coffers, Defendant invited several friends to attend and make donations, which, in contravention of campaign finance laws, defendant promised to reimburse.  His friends attended the golf outing, made the requested contributions, and were repaid by defendant within minutes of making the contribution.  Defendant used his friends to violate campaign finance laws in his quest to ingratiate himself with powerful people.

These are examples of the way Shulick treated other people, in all walks of life, when he thought no one else was looking.  These examples expose Shulick's character for what it is—and the court should consider that character in imposing sentence.

The destructive character that gave rise to Shulick's rancid antics is further confirmed in his sentencing filing. Far from accepting the jury's verdict, he plays with the numbers to claim that SDP suffered no injury from his embezzlement. He offers not a word of apology to the students who were deprived of counseling and adequate security, nor to the School District that was cheated out of nearly $1 million. Instead, he tries to reinvent the contract with a facile focus on price per student and a self-serving *ex post facto* shell game in which he seeks to burden the students at Southwest with DVHS expenditures that had nothing to do with his contractual obligations to educate those students. He relies on allocated costs that are derived from expenditures made on other students at other schools, fixed salary costs for employees who did not

work directly at Southwest, and large outlays for capital expenditures only a fraction of which could attributed to the two years. Here again Shulick tries to bend reality to fit his self-interest – the kids at Southwest will have to give him 100%, dollar for dollar, credit for spending money on computers and desks.  Never mind that those are capital expenditures that any accountant would amortize over 15 or 40 years. Shulick needs to lower his offense level and no allocation is too speculative to bend to his agenda. He has reached into every corner of DVHS to come up with expenses he can assign to Southwest.  He says not one word about the students at Southwest who were cheated out of the services SDP required Shulick to provide.  This approach to sentencing is one more example of Shulick's pathological insistence on twisting reality to serve his interest.

The trial evidence showed that defendant was a greedy, manipulative, and abusive co-worker and supervisor, who lacked any semblance of a moral compass.  The court should consider defendant's character in imposing sentence here.

**C.     The Need for Adequate Deterrence and Protection of the Public**

The need for adequate deterrence to this type of criminal conduct is great. Shulick took advantage of his position of trust to embezzle money from SDP. The Court should send a message to defendant Shulick, and to others who contract with public agencies, that they will earn a long sentence of incarceration if they betray the public trust. Deterrence is particularly important here, where the true victims were students in their formative years, trying to get their lives on the right track by getting a high

school diploma. A message should be sent that the Court will not tolerate exploitation of vulnerable young people to make a profit.

In addition, general deterrence is important because this type of crime is difficult to detect. SDP witnesses at trial described the major layoffs suffered by SDP during the contract years due to budget shortages. Public agencies often do not possess sufficient resources to micro-monitor contracts of this sort. Agents of the Federal Bureau of Investigation, Internal Revenue Service Criminal Investigation Division and U.S. Department of Education were required to use extraordinary efforts to successfully investigate Shulick's crimes. Had the thorough investigation of the agents not revealed Shulick's conduct, Shulick may have proceeded to obtain the benefit of his crimes without being caught.

The government submits that it is imperative that the Court send a strong deterrent message to those who, like Shulick, believe they can take advantage of public entities and vulnerable victims like the students at Southwest. A strong deterrent message is necessary here because the crime at issue is very difficult to detect and carries a grave risk to the public.  Only a lengthy prison sentence will send the necessary message to this defendant and to others that such conduct will not be tolerated.

### D.    The Need to Provide the Defendant with Training, Medical Care or Correctional Treatment

Although defendant has advised the Probation Office of certain health issues, the government is not aware of what care may be needed to address these issues.

31

**E.**   **The Need to Avoid Unwarranted Sentence Disparities Among Similarly Situated Defendants**

Adherence to the recommended guideline range is the only course for assuring that Shulick's sentence is consistent with those imposed nationwide on similarly situated offenders. In particular, the Court should consider the sentence of 60 months imprisonment imposed on Chaka Fattah Jr. Although Fattah Jr. was sentenced in part for many other offenses, the Court noted in sentencing Fattah Jr., that he had cheated not only SDP but "some of our neediest children." Sentencing Transcript, *United States v. Chaka Fattah, Jr.*, 2:14-CR-00409, February 2, 2016, p. 42. The Guidelines appropriately suggest a higher sentence for Shulick because he was the leader of this activity, he obstructed justice, and committed tax offenses of his own. He even participated with Fattah Jr. in lying to PNC Bank, and he did so in his capacity as a lawyer using his law firm letterhead to defraud the bank. Every aspect of Shulick's involvement suggests greater culpability than that of Fattah Jr.

The government's recommendation of a guidelines sentence is based in part on the fact that such a sentence serves the vital goal of uniformity and fairness. Reference to the sentencing guidelines, while carefully considering the 3553(a) factors particularly relevant to an individual defendant, is the best available means of preventing the disfavored result of basing sentences on the luck of the draw in judicial assignments.

### F.   <u>Restitution</u>

Consistent with the government's calculation of the loss, the Court should order defendant Shulick to pay restitution to the School District of Philadelphia in the amount of $948,234 in this case. In addition, the government respectfully requests that the Court impose restitution for Counts 9-11 based on the tax loss amount in those years of $38,462, which does not include the future loss calculated by the government. Guidelines § 5E1.1(a)(2); *see also Gall v. United States*, 21 F.3d 107, 109-10 (6th Cir. 1994).

## IV.   FORFEITURE

The government will file a Motion for Preliminary Order of Judgment and Forfeiture seeking a forfeiture money judgment of $838,234.  The government requests that the Court issue a Preliminary Order of Judgment and Forfeiture granting the government's motion.  Pursuant to Rule 32.2(b)(4), the Preliminary Order must be included in the judgment issued by the Court.

## V.   CONCLUSION

In sum, all of the appropriate considerations of sentencing favor the imposition of a sentence at the high end of the advisory guideline range of 87 to 108 months of imprisonment. The government also requests that the Court attach its Preliminary Order of Judgment and Forfeiture to the judgment order.

The government also recommends that the Court remand defendant Shulick to the custody of the U.S. Marshals immediately following the sentencing. Title 18, United States Code, Section 3143(a), provides as follows:

(a) Release or Detention Pending Sentence

Except as provided in paragraph (2), the <u>judicial officer</u> shall order that a person who has been found guilty of an offense and who is awaiting imposition or execution of sentence, other than a person for whom the applicable guideline promulgated pursuant to <u>28 U.S.C. 994</u> does not recommend a term of imprisonment, be detained, unless the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c). If the judicial officer makes such a finding, such judicial officer shall order the release of the person in accordance with section 3142(b) or (c).

Based on this statute, to be released after imposition of sentence, the defendant must prove by clear and convincing evidence that he is not likely to flee or pose a danger to the safety of any other person or the community if released.

34

The defendant cannot sustain his heavy burden of proof here. The magnitude of the sentence defendant is facing, the fact that he has not served a sentence of imprisonment previously, and the defendant's possession of the means to effectuate flight as evidenced by the information in the Presentence Investigation Report, makes the defendant a risk of flight. Consequently, the government recommends immediate remand.

Respectfully submitted,

WILLIAM M. MCSWAIN
United States Attorney

*/s/ Michael T. Donovan*
MICHAEL T. DONOVAN
CHRISTOPHER J. MANNION
Assistant United States Attorneys

Dated:  September 17, 2018

## CERTIFICATE OF SERVICE

I hereby certify that I caused a copy of the Government's Sentencing Memorandum to be served by electronic filing on the Court's Electronic Case Filing system on:

Hope Lefeber, Esquire at:  hope@hopelefeber.com

*Attorney for defendant David Shulick*


    */s/ Michael T. Donovan*
Michael T. Donovan
Assistant United States Attorney


Dated:  September 17, 2018